20-1508
FASORP v. New York University

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2020

No. 20-1508-cv

FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES,
*Plaintiff-Appellant*,

v.

NEW YORK UNIVERSITY, and MIGUEL CARDONA, in his official capacity
as U.S. SECRETARY OF EDUCATION, UNITED STATES OF AMERICA,
*Defendants-Appellees,*[*]

NEW YORK UNIVERSITY LAW REVIEW, NEW YORK UNIVERSITY SCHOOL
OF LAW,
*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York

---

[*] Under Fed. R. App. P. 43(c)(2), Miguel Cardona is, in his official capacity as Secretary of Education, substituted for his predecessor Betsy DeVos. The Clerk of Court is directed to amend the caption of this matter accordingly.

ARGUED: MARCH 5, 2021
DECIDED: AUGUST 25, 2021

---

Before: LEVAL, CABRANES, and MENASHI, *Circuit Judges*.

---

This appeal presents one threshold question: whether Plaintiff-Appellant Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP"), a membership association, has standing to sue Defendant-Appellee New York University. We hold that FASORP does not because it has failed to demonstrate injuries to its members. Accordingly, we **AFFIRM** the judgment of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*).

Judge Menashi concurs in a separate opinion.

---

> JONATHAN F. MITCHELL (Paul Niehaus, Kirsch & Niehaus, New York, NY, *on the brief*), Mitchell Law PLLC, Austin, TX, *for Plaintiff-Appellant*.
>
> TAMAR LUSZTIG (Arun S. Subramanian, Jacob W. Buchdahl, Jillian S. Hewitt, *on the brief*), Susman Godfrey LLP, New York, NY, *for Defendant-Appellee*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal presents one threshold question: whether Plaintiff-Appellant Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP"), a membership association, has standing to sue Defendant-Appellee New York University ("NYU"). We hold that FASORP does not, because it has failed to demonstrate injuries to its members. Accordingly, we **AFFIRM** the judgment of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*).

## I. BACKGROUND

Where, as here, a defendant moves to dismiss for lack of jurisdiction premised on the plaintiff's lack of constitutional standing, it is well settled that "we accept as true all material allegations of the complaint[] and . . . construe the complaint in favor of the complaining party."[1] We therefore accept as true the following allegations, drawn from FASORP's amended complaint, and construe them in FASORP's favor.

FASORP is an "unincorporated nonprofit membership association" whose members "include faculty, alumni, and students of law schools who oppose the use of race and sex preferences in faculty

---

[1] *Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (internal quotation marks and citation omitted).

hiring, student admissions, law review membership decisions, and law-review article selection."[2]

NYU is a private university located—as its name indicates—in New York, NY. The NYU Law Review (the "Law Review") is an academic publication edited and operated by students at the NYU School of Law ("the Law School").[3]

The Law School student editors of the Law Review, who select articles for publication, also select Law School students who will serve

---

[2] Plaintiff's Br. at 6. FASORP is organized under the laws of Texas.

[3] Scholars from other academic disciplines may be surprised to learn that legal academic journals are almost universally "under total student control" and have been since the founding of the first law review—the Harvard Law Review—in 1887 and the second law review—the Yale Law Journal—in 1891. ROBERT STEVENS, LAW SCHOOL: LEGAL EDUCATION IN AMERICA FROM THE 1850S TO THE 1980S 118 & 127 n.34 (1983). This has at times given rise to considerable angst and merriment in the legal academy. *See, e.g.*, Fred Rodell, *Goodbye to Law Reviews*, 23 VA. L. REV. 38 (1936-37) ("The students who write for the law reviews are egged on by the comforting thought that they will be pretty sure to get jobs when they graduate in return . . . and the super-students who do the editorial or dirty work are egged on even harder by the knowledge they will get even better jobs."); C. Steven Bradford, *As I Lay Writing: How to Write Law Review Articles for Fun and Profit: A Law-and-Economics, Critical, Hermeneutical, Policy Approach and Lots of Other Stuff That Thousands of Readers Will Find Really Interesting and Therefore You Ought to Publish in Your Prestigious, Top-Ten, Totally Excellent Law Review*, 44 J. LEGAL EDUC. 1, 13 (March 1994) ("*Law Professor's Editing Rule*: Change back everything the law review editors have done. After all, you're the one being paid to write, not them. Do you trust what a law student has to say about writing?" (emphasis in original)).

Terms such as "Law Review," defined for the purpose of this opinion, are substituted even into quoted material, where applicable, for consistency.

as future editors of the Law Review. The Law Review admissions process is competitive, with just fifty spots available on the Law Review each year.

Recently, the Law Review incorporated race and sex into its editor-selection process. Of the fifty available spots, fifteen students are selected based on their writing competition performance, fifteen students are selected based on their first-year grades, and eight students are selected based on a combination of the writing competition and their first-year grades. The remaining twelve spots are filled by the Law Review's Diversity Committee (the "Committee").

To decide which students will fill those twelve spots, the Law Review asks applicants to submit statements that describe personal characteristics, background, experiences, or qualifications that they would like to highlight for the Committee. The Committee then evaluates these personal statements, considering factors that include (but are not limited to) race, ethnicity, gender, sexual orientation, national origin, religion, socio-economic background, ideological viewpoint, disability, and age. In addition to these personal statements, applicants are also instructed to submit an anonymized version of their resume that does not include their name or address. The Law Review uses these personal statements and anonymized resumes to favor applicants who are women, racial minorities, and members of the LGBTQ community.

Quite apart from the process to select its editors, the Law Review also includes race and sex considerations in its article-selection process. The Law Review's website includes a statement that it is committed to "publishing scholarship written by authors from underrepresented backgrounds in the legal profession."[4] Authors that wish to submit their articles for consideration do so through a web-based submission service called Scholastica. The Law Review's Scholastica portal has been configured by the Law Review to invite (but not require) authors to provide certain demographic information when they submit articles for consideration, including race, sexual orientation, and gender identity.

On October 7, 2018, FASORP brought suit against NYU, the Law Review, the Law School (together, the "NYU Defendants"), and the United States of America and the Secretary of Education (the "Federal Defendants"), seeking declaratory and injunctive relief pursuant to Title VI of the Civil Rights Act of 1964[5] ("Title VI") and Title IX of the Education Amendments of 1972[6] ("Title IX").[7]

---

[4] Am. Complaint ¶ 25.

[5] 42 U.S.C. § 2000d *et seq.*

[6] 20 U.S.C. § 1681 *et seq.*

[7] FASORP had previously filed a complaint with almost identical allegations against Harvard Law School and the Harvard Law Review. That complaint was dismissed by the United States District Court for the District of Massachusetts on August 8, 2019. *Faculty, Alumni, and Students Opposed to Racial Preferences v. Harvard Law Review Ass'n*, Civ. No. 18-12105-LTS, 2019 WL 3754023 (D. Mass. Aug. 8, 2019). FASORP did not appeal the District Court's decision.

In January 2019, the District Court granted FASORP leave to file an amended complaint.

FASORP filed its amended complaint (the "Amended Complaint") on February 28, 2019. In the Amended Complaint, FASORP pleads that its members have standing to challenge the Law Review's article-selection and editor-selection processes, as well as the Law School's faculty-hiring processes, all of which FASORP alleges violated Title VI and Title IX by impermissibly considering sex and race in its selection and hiring decisions.

Specifically, FASORP pleads in its Amended Complaint that its members include "faculty members or legal scholars who have submitted articles to the Law Review in the past, and who intend to continue submitting their scholarship to the Law Review in the future."[8]

With respect to article-selection, FASORP alleges in its Amended Complaint that its "[f]aculty members . . . who submit articles to the Law Review are being subjected to race and sex discrimination because the Law Review gives preference to articles written by women and racial minorities at the expense of articles written by FASORP members who are white or male."[9] As a result, its members "will face discrimination on account of their race, sex, sexual

---

[8] Am. Complaint ¶ 42.

[9] *Id*. at ¶ 33.

7

orientation, or gender identity unless the Law Review is enjoined from enforcing its discriminatory article-selection policies."[10]

With respect to editor-selection, FASORP alleges that it has standing to challenge that process because "the articles that FASORP members submit to the Law Review are judged by less-capable students" because "the Law Review has subordinated academic merit to diversity considerations when selecting its members and editors."[11] That is, FASORP members will be injured by having "their submissions judged and evaluated by less capable students who made law review because of diversity criteria, and who leapfrogged students with better grades and writing-competition scores."[12] FASORP claims this matters because "these are the students who will ultimately make the career-altering decision of whether a professor's article gets accepted for publication or rejected."[13] And, even if a FASORP member's article is accepted, "[t]hose who have their articles accepted by the journal must submit to a student-run editing process, and the Law Review's use of sex and race preferences dilutes the quality of students who edit an author's piece."[14]

---

[10] *Id*. at ¶ 42.

[11] *Id*. at ¶ 34.

[12] *Id*. at ¶ 43.

[13] *Id*. at ¶ 34.

[14] *Id*. at ¶ 35.

With respect to NYU's faculty-hiring practices, FASORP pleads that its members "include individuals who have sought and applied for entry-level or lateral teaching positions at the Law School and intend to do so again in the future," or who "remain potential candidates for visiting professorships and lateral faculty appointments without any need to formally apply."[15] According to FASORP, "NYU Law School, along with nearly every other law school in the United States, discriminates on account of race and sex when hiring its faculty."[16] As a result, FASORP claims that its members "face or will face discrimination on account of their race and sex unless NYU is enjoined from using race and sex preferences in faculty hiring."[17]

On March 21, 2019, the NYU Defendants filed a motion to dismiss FASORP's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),[18] alleging that FASORP did not have standing to bring its suit. The Federal Defendants followed suit on May 9, 2019, moving to dismiss FASORP's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). On March 31, 2020, the District Court granted both motions to dismiss without prejudice, finding that FASORP lacked standing and that

---

[15] *Id*. at ¶ 45.

[16] *Id*. at ¶ 27.

[17] *Id*. at ¶ 45.

[18] In their motion to dismiss, the NYU Defendants asserted that the Law School and the Law Review should be dismissed as named defendants in FASORP's suit pursuant to Fed R. Civ. P. 4(m), on the basis that they are not legal entities amenable to service of process. FASORP did not object.

9

FASORP had failed to state a claim under Titles VI and IX.[19] FASORP then opted to stand on its Amended Complaint and judgment entered on May 4, 2020.

FASORP timely appealed.[20]

## II. DISCUSSION

We review a District Court's dismissal of a complaint for lack of standing *de novo*.[21]

FASORP, "as the party invoking federal jurisdiction, bears the burden of establishing" standing.[22] "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating'" each of the elements that make up the "'irreducible constitutional minimum' of standing."[23]

---

[19] Because we hold that FASORP has failed to establish Article III standing, we need not decide whether it also failed to state a claim for relief under Title VI and IX.

[20] In its opening brief, FASORP states that it "is not contesting the dismissal of the federal defendants, and it will no longer pursue claims or seek relief against the federal defendants in this litigation." Plaintiff's Br. at 9 n.2. Accordingly, the federal defendants did not file a brief in this appeal.

[21] *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 79-80 (2d Cir. 2005).

[22] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).

[23] *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In determining whether a party has standing to sue, we ask whether it "has alleged . . . a personal stake in the outcome of the controversy, [so] as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."[24] This limitation flows from Article III, Section 2 of the Constitution, which limits our jurisdiction to "Cases" and "Controversies."[25] Standing doctrine operates "to ensure that federal courts do not exceed their authority as it has been traditionally understood."[26]

One species of standing doctrine is associational standing: When does an organization, such as FASORP, have a personal stake in the outcome of a litigation such that it is entitled to sue? Organizations may have standing to challenge actions that cause them direct injury.[27]

---

[24] *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972) (internal quotation marks and citation omitted).

[25] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citing U.S. CONST. art III, § 2).

[26] *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (quoting *Spokeo*, 136 S. Ct. at 1547).

[27] *Warth*, 422 U.S. at 511 (An organization can "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982) ("[O]rganizations are entitled to sue on their own behalf...."); *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("Under this theory of 'organizational' standing, the organization is just another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself must meet the same standing test that applies to individuals." (internal quotation marks and alterations omitted)).

But an organization also has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[28]

To establish the first prong of this test, an organization must satisfy the familiar three elements of standing under Article III. That is, FASORP must show that one or more of its members has: (1) "suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."[29]

   a. *Identification of Members*

As an initial matter, in asking whether FASORP has standing to challenge the Law Review's article-selection and editor-selection processes and NYU's faculty-hiring process on behalf of its members,

---

[28] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see, e.g.*, *Warth*, 422 U.S. 490, 511 (1975) (calling this approach "representational" standing); *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (calling it "associational" standing); *see also New York C.L. Union*, 684 F.3d at 294 (describing the various terms referring to this approach).

[29] *LaFleur v. Whitman*, 300 F.3d 256, 269 (2d Cir. 2002) (internal quotation marks omitted).

we are mindful that "[s]tanding . . . is not an ingenious academic exercise in the conceivable . . . but requires a factual showing of perceptible harm."[30] Accordingly, the Supreme Court "has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."[31]

Still, FASORP argues that it is not required to "name names" of injured members in its standing allegations at the pleading stage.[32] But, even if FASORP is not required to "name names," standing pleadings "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."[33] And, as relevant here, FASORP "must allege facts that affirmatively and plausibly suggest that it has standing to sue."[34]

---

[30] *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009) (internal quotation marks and alteration omitted).

[31] *Id*.

[32] Here, FASORP relies on *Bldg. & Const. Trades Council of Buffalo, N.Y. and Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("An association bringing suit on behalf of its members must allege that one or more of its members has suffered a concrete and particularized injury, as the plaintiffs do. But the defendants cite to no authority—nor are we aware of any—that supports the proposition that an association must 'name names' in a complaint in order properly to allege injury in fact to its members." (internal citation omitted)).

[33] *Lujan*, 504 U.S. at 561.

[34] *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

13

By way of identifying members who have suffered the requisite harm, FASORP only asserts that its membership includes "faculty members or legal scholars who have submitted articles to the Law Review in the past, and who intend to continue submitting their scholarship to the Law Review in the future" and "individuals who have sought and applied for entry-level or lateral teaching positions at the Law School and intend to do so again the future, or remain potential candidates . . . ."[35] FASORP argues that "[i]t's hard to get more specific than that."[36] We do not agree. It is possible to be more specific—even if "naming names" and submitting individual affidavits is not required. For example: When did FASORP's members submit articles or apply for jobs at NYU? Have those members drafted articles they intend to submit? If so, when do they plan to submit? Instead, FASORP effectively asks us to accept a "self-description of the activities of its members" and to conclude that "there is a statistical probability that some of those members are threatened with concrete injury."[37] Such allegations are plainly insufficient to show that FASORP's members have suffered the requisite harm here.

---

[35] Am. Complaint ¶ 42, 45. Although FASORP alleges that its members who are alumni or students will be injured, Am. Complaint ¶ 35-39, FASORP does not specifically allege that its members actually include any alumni of the Law Review or NYU students. Further, while FASORP contends that it has "never 'admitted' that it has no student or alumni members," FASORP concedes that "it is simply not asserting *standing* on their behalf in this particular lawsuit against NYU." Plaintiff's Reply Br. at 21 n.17 (emphasis in original).

[36] Plaintiff's Br. at 13.

[37] *Summers*, 555 U.S. at 497.

*b. Injury-In-Fact*

Even if FASORP's pleadings were found to sufficiently "identify members who have suffered the requisite harm,"[38] FASORP fails to demonstrate that those members have experienced an "invasion of a legally protected interest"[39] that is "'certainly impending'" or that "there is a 'substantial risk' that the harm will occur."[40]

With respect to its challenges of faculty-selection and article-selection procedures, FASORP only alleges a "highly attenuated chain of possibilities"[41] in its Amended Complaint, starting with its allegations that its faculty or scholar members will be injured—*i.e.*, discriminated against—because they "*intend* to continue submitting their scholarship" and "*intend*" to apply for jobs at the Law School, or remain candidates for recruitment to the faculty at the Law School.[42]

With respect to FASORP's challenge to the Law Review's editor-selection process, FASORP notably does not claim to have any Law Review "alumni" or NYU "student" members. Nor does FASORP plead that any of its members have applied for, or were rejected from, the Law Review's editorial board. To overcome this deficit, FASORP

---

[38] *Summers*, 555 U.S. at 499.

[39] *Lujan*, 504 U.S. at 560.

[40] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Intern.*, 568 U.S. 398, 414 n.5).

[41] *Id*.

[42] Am. Complaint ¶¶ 42, 45 (emphasis added).

15

instead argues that its faculty and scholar members have standing to challenge the Law Review's editor-selection process because the "use of race and sex preferences [in the editor-selection process] affects the composition of students who select and edit the articles submitted by FASORP members."[43]

The primary defect in all these theories is that there is uncertain future action that would need to occur before the plaintiffs could arguably suffer the harm alleged. Without any "description of concrete plans" to apply for employment, submit an article, or of having submitted an article, that will or has been accepted for publication, FASORP's allegations exhibit the kind of "some day intentions" that cannot "support a finding of [] actual or imminent injury."[44]

To avoid this problem specifically with regard to editor selection, FASORP argues that its faculty or scholar members are injured in the same way that a criminal defendant is injured when his "juror-selection process [is] tainted by unlawful racial discrimination"—that is, FASORP members are injured by virtue of having their articles judged by student editors whose admissions process was tainted by unlawful discrimination.[45] FASORP relies on *Powers v. Ohio*[46]—in which the Supreme Court held that a criminal

---

[43] Plaintiff's Br. at 27-28.

[44] *Summers*, 555 U.S. at 496 (quotation marks and citation omitted).

[45] Plaintiff's Br. at 28.

[46] 499 U.S. 400 (1991).

16

defendant can contest peremptory challenges exercised to exclude jurors based on race even if the defendant and the jurors share the same race—to support this argument. But this reliance is inapposite because *Powers* depended on special considerations relating to criminal justice that are inapplicable here. In *Powers*, the Court held that a criminal defendant is injured by a tainted process even if that tainted process could inure to his benefit because racial discrimination in the selection of jurors "casts doubt on the integrity of the judicial process, [] places the fairness of a criminal proceeding in doubt," and "condones violations of the United States Constitution within the very institution entrusted with its enforcement."[47] That the state would reinforce unlawful racial discrimination by sanctioning it in juror selection is not a concern present in this case. Therefore, with respect to the editor-selection process FASORP's allegations still fall short of suggesting an injury that is certainly impending or substantially likely to occur so as to constitute an injury-in-fact.

\* \* \*

In sum, we hold that FASORP's pleadings in the Amended Complaint do not suffice to show that its members have suffered an injury-in-fact.[48] FASORP has thus not demonstrated it has standing

---

[47] *Id.* at 411-12 (internal citation omitted).

[48] Because we conclude that FASORP has not sufficiently pleaded an injury-in-fact, we do not go on to examine the other elements of Article III standing: causation and redressability.

based on injuries to its members, as would be required to maintain this suit.

### III. CONCLUSION

For the foregoing reasons, we hold that the District Court properly dismissed FASORP's Amended Complaint.

We have previously observed that "where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice rather than with prejudice."[49] After all, "[s]uch a dismissal is one for lack of subject matter jurisdiction, and without jurisdiction the district court lacks the power to adjudicate the merits of the case."[50]

Accordingly, we **AFFIRM** the District Court's judgment dismissing the Amended Complaint without prejudice.

---

[49] *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016).

[50] *Id*. (internal quotation marks and citations omitted); *see also Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999) ("[I]t is our view that Article III deprives federal courts of the power to dismiss a case with prejudice where federal subject matter jurisdiction does not exist.").